ZDANIS LAW FIRM, PLLC
By: Karen L. Zdanis, Esq. (KZ3651)
55 Old Turnpike Road, Suite 304
Nanuet, New York 10954
Tel (845) 356-0855

STEGER KRANE LLP
By: Michael D. Steger, Esq. (MS2009)
30 Ramland Road, Suite 201
Orangeburg, NY 10962
(845) 359-4600

*Attorneys for Plaintiff*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 14 CIV. 6325

## JUDGE BRICCETTI

-------------------------------------------------- x

KERNS MENARD,

        Plaintiff,

against,

14 Civ. _____

**COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

CHRYSLER GROUP LLC,

        Defendant.

-------------------------------------------------- x

       Plaintiff Kerns Menard ("Plaintiff" or "Menard"), by his by his attorneys, ZDANIS LAW

FIRM, PLLC and STEGER KRANE LLP, complaining of Defendant herein, alleges, upon

knowledge as to himself and his own actions, and upon information and belief as to all other

matters:

## <u>NATURE OF CLAIMS</u>

    1.     This is a racial discrimination case brought pursuant to 42 U.S.C. § 1981

(hereinafter referred to as "Section 1981), Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. § 2000e, the New York Human Rights Law, New York Executive Law Section 290 *et*

*seq.* (the "Executive Law"), and Sections 191 and 198 of Article 6 of the New York Labor Law (the "Labor Law"). Mr. Menard also asserts a breach of wage and hour claim (improper deductions from paycheck) and a common law breach of contract claim.

2.     Plaintiff is a black man of African American background. As set forth herein, Menard was subjected to disparate treatment as a result of his race and his ethnicity. In addition, Mr. Menard was the victim of a hostile work environment that disfavored him and, upon information and belief, other black and minority employees at the Defendant Chrysler Group, LLC ("Chrysler"). Finally, Mr. Menard was further harassed and eventually terminated by Chrysler as reprisal for filing a discrimination charge. Chrysler terminated Mr. Menard shortly after Chrysler received notice that Mr. Menard was filing a lawsuit against Chrysler instead of pursuing his discrimination charge in the New York State Division of Human Rights ("NYS DHR"), and within months after Chrysler had received notice from the NYS DHR that Mr. Menard filed a claim of discrimination with this governmental agency.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over plaintiff's federal claims under 42 U.S.C. § 1981, 28 U.S.C. § 1331, and over his pendent state law claims pursuant to 28 U.S.C. § 1367. The Plaintiff alleges that the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs attendant to the litigation.

4.     Venue is founded in the Southern District of New York pursuant to 28 U.S.C. §1391(a) and 28 U.S.C. §1391(b), and within this division because Menard worked for Chrysler in Rockland County, New York.

## PARTIES

5.      Plaintiff Kerns Menard resides in Thiells, New York, and is a resident of this District.

6.      Defendant Chrysler maintains its headquarters in Auburn Hills, Michigan and operates its Northeast Business Center in the state of New York.

7.      Defendant Chrysler is a successor company and/or a successor in interest of The Chrysler Corporation, DaimlerChrysler, and Chrysler LLC.

## FACTUAL ALLEGATIONS

8.      Mr. Menard is a 50 year-old black man of African American background who was employed by Chrysler for approximately 28 years, from 1986 until Chrysler wrongfully terminated him on May 7, 2014.

9.      During the last few years of his employment Mr. Menard was a top-performing sales/field manager

10.     Beginning in about 2007, Mr. Menard was subject to a hostile work environment at Chrysler caused by Jeffrey Kommor.  Jeffrey Kommor is a white male who has been employed by Chrysler in a managerial position since 2007. Mr. Kommor is currently approximately 50 years old.

**Menard's Job Performance was Outstanding**

11.     Mr. Menard was highly qualified for his position, and as of September of 2009, Mr. Menard completed 105% of his Final Allocation objectives, and finished thirteenth out of 23 District Managers on Area Performance, twelfth out of 23 District Managers on retail tracker standing for September of 2009, and fifth out of 22 Districts on sales objectives.

3

12.     Mr. Menard continuously performed above his targets and above average. Mr. Menard finished at 127% of his goal in the Business Sale vs. Target of Trucks, an important area for Chrysler, and was at 103% of his goal as Sales Area/District Manager in or about September of 2013. Mr. Menard ranked in the top ten overall in Chrysler's Final Let's Get Paid objective. In the Top Volume rankings, Mr. Menard achieved 117% of his goals in the year over year comparison, and 103% of his projected program.

13.     By the end of 2013, Mr. Menard accomplished the following results versus target: Retail Share Volume 105.1%; Retail Share 103%, Retail Shipments 91.2%, Digital Engagement 100.2%.

14.     As of March 17, 2014, Mr. Menard continued to perform above average as an Area or District Manger.  Nine of the eleven dealerships Mr. Menard serviced had attained their forecasted "fast start tracker" targets/goals and seven of the eleven dealerships had reached their fast start goals.  As of this date, Mr. Menard's dealerships fulfilled a higher percentage of this fast start goal attainment than any other Area/District in the Northeast Business Center.

15.     In or about March of 2014, Mr. Menard conducted a survey of the dealerships he serviced, and the results obtained demonstrate that all of the dealers were more than satisfied with Mr. Menard's level of service, frequency of visits, and accessibility.  Mr. Menard received excellent feedback, and even non-solicited feedback including statements that Mr. Menard was "there when I need you [him]" and "does his job in a professional manner and has been a great help to our dealership."

**Racial Comments, Discriminatory Treatment and Hostile Work Environment**

16.     Despite Mr. Menard's good performance, he was harassed and discriminated against on account of his race and national origin, first by senior manager Jeffrey Kommor, and later by Mr. Kommor's subordinates.

*A. "Thief" Comment at Las Vegas Conference*

17.     Mr. Kommor repeatedly screamed at Mr. Menard and made racially motivated and inappropriate remarks to Mr. Menard.  For example, in or about 2007 during a conference in Las Vegas, Nevada, Mr. Kommor told a white dealer to check to see if his watch was still on his wrist after shaking Mr. Menard's hand. Mr. Kommor barely knew Mr. Menard at the time and the comment was clearly discriminatory because it was intended to signal that Mr. Menard was a thief because he was black and a minority.  When Mr. Menard later approached Mr. Kommor to address the issue and tell him he did not appreciate the inappropriate comment, Mr. Kommor refused to discuss his comments, and instead walked away.

18.     Mr. Menard subsequently reported this incident to his supervisor, Jerry Canlas, who told Mr. Menard to discuss the incident with Mr. Kommor.

19.     When Mr. Kommor first supervised Mr. Menard, beginning in or about 2007, he was a Senior Manager for Chrysler.

20.     When Mr. Kommor became Mr. Menard's supervisor he harassed Mr. Menard more frequently, and on several occasions unjustifiably screamed at Mr. Menard.  Other employees took note of Mr. Kommor's outward hostility to Mr. Menard, and they told Mr. Menard it was difficult to believe that Mr. Kommor made these inappropriate statements in a business setting.

### B. Kommor Made Blatant Racial Jokes About Watermelon and Fried Chicken at a Company Picnic

21.     In 2009, at a company picnic at Chrysler's Tappan, New York office, when Mr. Kommor was two levels above Mr. Menard in Chrysler's management structure, he approached Mr. Menard with a sinister smile and asked him if he would like some watermelon.  The watermelon stereotype is a racist stereotype of African Americans that indicates that black people have an unusual appetite for watermelons. Historically, defenders of slavery used watermelon to paint black people as simple-minded beings who were happy when provided watermelon and a little rest. The stereotype was perpetuated in minstrel shows often depicting black people as ignorant and lazy, given to song and dance and inordinately fond of watermelon.

22.     Later the same day, Mr. Kommor approached Mr. Menard again and said "I guess you are going to take those fried chicken wings home." Fried chicken, like watermelon, is another food that has been a mainstay in racist depictions of blacks.

23.     The watermelon and fried chicken comments were both racially motivated 'jokes' and attempts to embarrass Mr. Menard and make him feel uncomfortable.

24.     Again, after Mr. Menard approached Mr. Kommor to tell him that he did not appreciate the comments, Mr. Kommor ignored him and walked away.

25.     Shortly after the company picnic, Mr. Menard reported Mr. Kommor's discriminatory and racist comments to Chrysler's Human Resources Department, yet Human Resources personnel failed to take corrective action.

### C. Changing Rules of Incentive Program to Cut Out Mr. Menard

26.     In yet another incident, Mr. Kommor decided to change the rules of Chrysler's sales incentive program *post-hoc* to prevent Mr. Menard from receiving the incentive prizes Mr. Menard had already earned. In particular, after Mr. Menard had already won six prizes, Mr.

Kommor attempted to change the rules to exclude any personnel who had already won six prizes from winning any more prizes. After Mr. Kommor's decision was overridden by his boss, Mr. Kommor approached Mr. Menard and in a threatening tone told Mr. Menard "I could be your boss one day."

### D. Inappropriate Cursing and "Watch You Like a Hawk" Threats

27.     Mr. Kommor directly supervised Mr. Menard in 2009, when Mr. Kommor was promoted to a Field Operations Manager. During that period, Mr. Menard's first interaction with Mr. Kommor was upon Mr. Menard's return from a short assignment to the Service Department. Chrysler had assigned him to the Service Department temporarily because of layoffs. In particular, Mr. Kommor told Mr. Menard, "We got you back in sales, but no more f$#!ing around in the wholesale room." This was only one of more than two dozen times Mr. Kommor cursed at Mr. Menard without reason. During this occasion, Mr. Kommor also told Mr. Menard he would be watching him "like a hawk" and "I don't trust you and [Mr. Menard] I don't like you."

### E. Transfer to a Position 78 Miles Away without Relocation for Less Compensation

28.     Mr. Kommor further demonstrated his animus against Mr. Menard by immediately transferring and demoting Mr. Menard to a district in New Haven, Connecticut.

29.     Mr. Kommor transferred Mr. Menard to this New Haven District to make work conditions more difficult for Mr. Menard for less pay, as the commute was arduous and it provided far less opportunity for incentive pay than in Mr. Menard's previous job, and was thus less compensation for Mr. Menard.

30.     In addition, Mr. Kommor transferred Mr. Menard to the New Haven District so that work would be more intolerable for Mr. Menard. Because of this transfer Mr. Kommor

7

forced Mr. Menard to withstand an arduous commute. In addition, Mr. Kommor maintained

control of Mr. Menard the fact that Mr. Kommor transferred Mr. Menard into a position

supervised by Joshua Genicoff, Mr. Kommor's godson and a white male in his mid-twenties who

was relatively inexperienced and heavily influenced by Mr. Kommor.

31.     The New Haven District to which Mr. Kommor transferred Mr. Menard was

approximately 78 miles away from Mr. Menard's home and thus required Mr. Menard to

commute approximately four to six hours a day roundtrip, depending on traffic.  This commute

was in addition to the time Chrysler required Mr. Menard to travel between the dealerships

during a normal workday.  Despite the long commute, and contrary to Chrysler's policy, Mr.

Kommor did not offer Mr. Menard a relocation package.

32.     This New Haven District was far less desirable than the district that Mr. Menard

was previously assigned to, not only because it was far away, but also because it had no New

York Metro Districts (which Mr. Menard supported prior to this transfer).  New York Metro

Districts are high-performing dealerships in more densely populated regions that historically sold

more vehicles than non-New York Metro Districts.

33.     At the time when Mr. Kommor transferred Mr. Menard to the New Haven

District, Mr. Menard's performance had been excellent, and there was no *bona fida* business

reason for the transfer.

34.     Mr. Kommor disparately treated Mr. Menard and other black and minority

employees by transferring them to less desirable jobs.

**F. Chrysler Imposes Its First Bogus "Performance Improvement Plan"**

35.     In 2009, Mr. Kommor handed Mr. Menard a spurious Performance Improvement

Plan ("PIP"), which Mr. Kommor used solely to harass and intimidate Mr. Menard instead of for

8

any legitimate purpose. The PIP had no merit and lacked specificity, yet required Mr. Menard to improve his performance with no guidance or specific measurable performance goals. The PIP consisted of vague, false accusations of alleged deficiencies concerning Mr. Menard's performance. For example, the PIP alleged that Mr. Menard needed to "improve leadership skills required to drive change," and "transition from wholesale to retail focus below expectations." The allegations of deficiency were not tied to any performance metrics and contradicted Mr. Menard's actual measured performance results.

36.     Chrysler never gave Mr. Menard any verbal or a written warning of any performance issue prior to receiving the 2009 PIP.

37.     Further, Mr. Kommor provided unjustified PIPs to other black and minority employees disparately, as a tool to discriminate against persons of color and persons that Mr. Kommor wanted fired, transferred, or removed from his region on account of their race and/or national origin.

### G. Chrysler Transfers Mr. Menard to a Telemarketing Position

38.     Despite Mr. Menard's stellar employment record, Mr. Kommor then used the PIP to provide a pretextual reason to transfer Mr. Menard to the less desirable and embarrassing position of a telemarketing District Manager.

39.     This telemarketing position involved servicing small dealers by telephone throughout a large region. Mr. Kommor intended to embarrass and demoralize Mr. Menard by transferring him to this position, which was customarily reserved for new hires who needed to obtain experience. This telemarketing position was a more junior position than every other job Mr. Menard held at Chrysler during the 22 years before this demotion because it involved only telephone calls, and did not entail developing good relationships with large dealers. Moreover,

this demotion did not permit him to make in-person meetings or visits, and prevented Mr. Menard the ability to maintain the good interpersonal professional relationships he had successfully developed.

40.     Moreover, the telemarketing position was a demotion because the variable compensation incentive pay was lower than his previous compensation. The dealerships serviced by the telemarketing group were in rural regions with small populations and lower sales than dealerships serviced by field salespersons.

### H. Written Report of Discrimination against Kommor

41.     In or about October of 2009, Mr. Menard filed a written grievance with Chrysler's Human Resources Department, notifying Chrysler of Mr. Kommor's racist and ethnically biased statements and inequitable treatment.

42.     Chrysler's Human Resources did not respond to this grievance, and did not inform Mr. Menard that it took any action in response to the grievance.

### I. Chrysler Ignored Kommor's Discrimination and Promoted Kommor

43.     Chrysler ignored Mr. Menard's discrimination complaints and promoted Mr. Kommor to a new position, the Director of its Midwest Business Center in or about 2010.

44.     Within six months of Mr. Kommor's transfer to the Midwest, Phil Scrogin, the North East Business Center Director at the time, transferred Mr. Menard back to work in the New Haven District, and out of the telemarketing assignment Mr. Kommor had placed him in.

45.     Chrysler then promoted Mr. Kommor to Director – Northeast Business Center in or about 2012 and in or about this time he returned to the East Coast.

46.     Despite Mr. Kommor's previous discriminatory actions, and Mr. Menard's 2013 grievance and dual filing of a discrimination charge with the New York State Division of Human

Rights and Equal Employment Opportunity Commission in or about October of 2013, Chrysler promoted Mr. Kommor to Vice President of U.S. Sales Operations in or about 2014.

47.     Mr. Kommor's physical office as Vice President is located in the Midwest, upon information and belief at Chrysler's headquarters in Detroit. However, Mr. Kommor oversees the entire United States in this field and has even more influence over his subordinates, namely Brad Meredith and Thomas Shanley. Mr. Kommor is Mr. Shanley's boss, who is Mr. Meredith's boss and therefore Mr. Kommor has influence over the entire chain of command.

### J. Retaliation – Chrysler's Continued Harassment of Mr. Menard and Hostile Work Environment

48.     Ever since Mr. Menard complained to Chrysler (first by himself and later with the assistance of an attorney) in 2013, and especially subsequent to filing a discrimination charge with the New York State Division of Human Rights and Equal Employment Opportunity Commission, Chrysler's management has scrutinized Mr. Menard's every action. Mr. Meredith continued to give Mr. Menard a difficult time at work until Chrysler terminated Mr. Menard.

49.     Upon Mr. Kommor's return to the Northeast in or about 2012, Mr. Kommor and his staff repeatedly and unjustifiably screamed at Mr. Menard, put Mr. Menard down, made unwarranted threats to Mr. Menard's job, and purposely attempted to embarrass and/or set Mr. Menard up for failure.

50.     When Mr. Kommor was again promoted, Mr. Kommor's discriminatory animus was carried out by his subordinate, Brad Meredith, who became Mr. Menard's supervisor in or about 2013.

51.     Subsequently, when Thomas Shenley was hired into the Northeast Business Center after Mr. Kommor was transferred to the Midwest, things improved temporarily until Mr. Shanley discovered that Mr. Menard had filed a complaint with the New York State Division of

11

Human Rights and the EEOC.  Mr. Shanley specifically asked Mr. Menard something to the effect that "How are we supposed to employ you if you sued the company?" Mr. Shanley confronted Mr. Menard and expressed that he was disgusted by the fact that Mr. Menard had "sued" Chrysler, and Mr. Shanley then expressed a hostile attitude toward Mr. Menard

52.     On July 23, 2013, Mr. Kommor removed Mr. Menard from the distribution list of an email that notified all District Managers of the required attendance of their Districts on a scheduled webinar/conference call. Mr. Menard learned of the conference call from other means, and when he sent an email to his supervisor, Mr. Meredith, inquiring about the webinar/call, Mr. Meredith only notified him of the specifics only 49 minutes before the call, despite the fact that the webinar required the participation eleven of Mr. Menard's dealerships.

53.     In addition, when Mr. Menard was late in submitting expense reports because of the long commute (caused by Mr. Kommor), Mr. Kommor yelled and cursed at Mr. Menard. Mr. Menard was not the only employee who submitted late expense reports, however upon information and belief, no other white or non-minority employee was screamed at for late expense reports.

54.     Subsequently, Mr. Meredith denied Mr. Menard reimbursements on expense reports for unjustified reasons. He cited policies which were not provided to Mr. Menard until after he submitted the reports, and policies which were not enforced against whites and non-minorities.

55.     Mr. Meredith wrongfully accused Mr. Menard of submitting expenses for gasoline Mr. Menard used for his personal vehicle when Mr. Meredith knew that the accusations were unjustified, and Mr. Meredith's accusations were intended to intimidate and harass Mr. Menard.

56.     In or about this time, Mr. Meredith also began replicating Mr. Kommor's outward hostility against Mr. Menard. On or about August 16, 2013, Mr. Meredith cursed and threatened Mr. Menard after Mr. Menard made an email inquiry. Specifically, Mr. Menard asked Mr. Meredith how the criteria had changed for the allocation of 2014 Field Cars to District Managers, because Mr. Menard and other District Managers were not given the 2014 Field Car of their choice, which was contrary to past practice, and the allocation appeared arbitrary and discriminatory. Upon merely making this inquiry, Mr. Meredith cursed and told Mr. Menard "quit if you don't not like it or "I will make you quit."

57.     After this challenge Chrysler finally gave Mr. Menard a 2014 Field Car, but one without GPS or without a U-Connect system, essential tools for his job, which were always provided in the past.

58.     On or about August 9, 2013, Mr. Meredith unjustifiably docked Mr. Menard's pay for leaving the District that day despite the fact that Mr. Menard had already worked a full day. Mr. Meredith was aware that Mr. Menard worked a full day because he was in communication with Mr. Menard until late that evening.

59.     In September of 2013 Mr. Meredith's and Mr. Kommor's staff refrained from assisting Mr. Menard, thereby affecting Mr. Menard's ability to properly service his dealerships and thus jeopardizing his job. Upon information and belief, the staff was advised by Mr. Meredith and Mr. Kommor to ignore and/or refrain from assisting Mr. Menard. Mr. Menard never had been ignored by the staff prior to this, especially in ways that would affect his relationships with dealers, as had occurred in or about September of 2013.

60.     For example, Mr. Menard learned that nine pre-specs of Cherokee automobiles and five Grand Cherokee Diesels were scheduled to be delivered to one of Mr. Menard's

dealerships on September 5, 2013. These particular vehicles were originally scheduled to be delivered to his New Haven District. However, they were diverted to Branhaven without explanation and without advising Mr. Menard. When Mr. Menard learned of the diversion, Mr. Menard made inquiries to Mr. Genicoff and learned information lending to the conclusion that this was another discriminatory act aimed at further impeding his ability to perform his job effectively.

61.     In addition, Mr. Kommor and Mr. Meredith inflated Mr. Menard's district reassignments and required Mr. Menard to complete more reviews and sell more vehicles than other white and non-minority District Managers despite the fact that the other District Managers managed districts with comparably higher retail shares and sales.

62.     On September 16, 2013, within two weeks of contacting Chrysler's Human Resources Department to report the discriminatory actions described above, Mr. Kommor placed Mr. Menard on another unwarranted PIP to further bully Mr. Menard send a message to him that Mr. Kommor was in power.

63.     In addition, Chrysler alleged that one of Mr. Menard's dealers complained about him, but refused to provide Mr. Menard with the name of the person who complained, and refused to provide Mr. Menard with any information or constructive criticism regarding the complaint. Upon information and belief Chrysler fabricated and/or miscommunicated this allegation. Mr. Menard maintained very strong relationships with his dealers.

64.     In or about late 2013, Mr. Menard requested that Mr. Meredith and/or Chrysler survey the dealerships he serviced to learn of their level of satisfaction with Mr. Menard, however Chrysler and Mr. Meredith declined Mr. Menard's request.

14

65.     In or about September of 2013, Chrysler placed Mr. Menard on another bogus Performance Improvement Plan ("PIP") despite the fact that Mr. Menard was one of the highest performing District Managers in his territory.

66.     The PIP had no practical effect other than to permit Chrysler to treat Mr. Menard differently and be under more intense scrutiny.  The PIP required Mr. Menard to provide weekly itineraries and be subject to dealership meetings supervised by Craig Weyant, a much younger employee with significantly less experience than Mr. Menard.  Mr. Weyant lacked the outstanding long-term track record of Mr. Menard.  Mr. Weyant was Mr. Meredith's Assistant and had approximately three years' experience in the field compared to Mr. Menard's 29+ years. In addition, Mr. Weyant's presence at Mr. Menard's meetings with dealers was detrimental to Mr. Menard's relationship with his dealers.

67.     Upon information and belief, Mr. Weyant's assignment to "monitor" or "supervise" Mr. Menard's work was intended to be punitive and embarrass and harass Mr. Menard.

68.     Mr. Weyant's 'monitoring' or "supervising" Mr. Menard was disingenuous.  For example, Mr. Wyant was mainly complementary towards Mr. Menard in person, but made unwarranted remarks in front of dealers that reflected poorly on Mr. Menard. Mr. Weyant also sent emails, upon information and belief at the behest of Mr. Meredith and/or Mr. Kommor, concerning inaccurate and unfair criticisms about Mr. Menard that incorrectly blamed Mr. Menard for events that transpired.

69.     Mr. Weyant continued to monitor Mr. Menard even after the PIP concluded and Mr. Meredith advised Mr. Menard that he "passed" the PIP and that it was 'over.'

70.     Chrysler singled out Mr. Menard, and he was the only employee subjected to this monitoring until Mr. Menard complained.  Subsequently other employees were also monitored after Chrysler was warned about the further discriminatory treatment.

71.     Yet, even after the PIP concluded, Chrysler continued to single Mr. Menard out by instructing Mr. Menard to provide his weekly itineraries to Mr. Weyant despite the fact that no other non-minority employee was asked to do this.

72.     In or about September of 2013, after Mr. Menard wrote Chrysler's Human Resources and/or Diversity group to again request their help with the continued discrimination Chrysler was inflicting on him, Chrysler again ignored Mr. Menard's requests and instead took further retaliatory actions.

73.     Shortly thereafter, Mr. Menard's attorney requested in writing that Chrysler cease and desist from the discriminatory actions, and further notified Chrysler of Mr. Menard's intention to pursue his discrimination claims if the discrimination did not stop.  In response, Chrysler took further discriminatory and retaliatory actions.

74.     Instead of stopping the discrimination and assisting Mr. Menard, Chrysler again ignored Mr. Menard's requests; Mr. Kommor, Mr. Meredith and their subordinates continued to harass and discriminate against Mr. Menard.

75.     For year-end 2013, Mr. Meredith provided Mr. Menard with a specious Performance Review that did not provide an accurate reflection of Mr. Menard's good performance or his achievements for the calendar year 2013. In this review, Chrysler downgraded Mr. Menard's performance over the prior year from "medium" to "low" in ten leadership item areas without any basis. Mr. Meredith never substantiated any of the downgrades.

76.     The review's assertion that Mr. Menard lacked leadership is contradicted by the verbal compliments Mr. Meredith discussed with Mr. Menard during their meeting pertaining to the review. The comment that Mr. Menard needed to improve his time management skills because he was late to one meeting with a dealer due to a 45 minute traffic jam, is hypercritical, especially because the dealer was aware of the bad traffic problems that the affected area experienced that given day.

77.     In addition, on February 25 and 26, 2014, Mr. Menard was visibly sick with the flu during the work day.  Mr. Weyant saw Mr. Menard and witnessed that Mr. Menard was visibly ill, yet Mr. Meredith required Mr. Menard to bring in a doctor's note to further harass Mr. Menard.

78.     In another attempt to harass Mr. Menard, Chrysler increased Mr. Menard's objectives for the allocations of reassignments and shipments so that Mr. Menard's targets were proportionally higher than other District Managers, as compared with the history of sales for their respective dealerships. For example, Chrysler required Mr. Menard's District to sell more Durangos and Diesels than a *pro rata* share would fairly dictate.

79.     Chrysler also classified more dealers in Mr. Menard's district Customer Experience Initiative ("CEI") Target Dealers than in comparable districts in order to require Mr. Menard to spend a lot of time working with these dealers on an initiative that was not really indicative of customer satisfaction.

80.     Upon information and belief, as additional discrimination and reprisal, Mr. Meredith, who supervised Chrysler's Operations Management Team that was responsible for supporting District Managers such as Mr. Menard, instructed this team to provide inferior service

to Mr. Menard. Beginning in or about 2013, and for the first time in his career, Mr. Menard
needed to ask team members five or six times before getting a response.

81.     On or about March 4, 2014, Mr. Menard was instructed to attend a meeting
concerning only Mr. Menard's expense reports. Attendees at the meeting were three upper-level
managers, specifically Brad Meredith, Thomas Shanley, and Mike Brown, from Corporate HR,
the latter *via* telephone. During the meeting Chrysler grilled Mr. Menard for over forty-five
minutes on the expense reports that Mr. Menard had submitted. Mr. Meredith presented Mr.
Menard a one-page typed out memo containing information regarding nine fuel purchases (date,
day, time, location, and amount), and required Mr. Menard to defend every fuel purchase listed
despite the fact that Chrysler already had the supporting documentation. Mr. Meredith never
indicated why he did not share this memo with Mr. Menard prior to the meeting as Mr. Menard
had requested.

82.     During this meeting Mr. Menard successfully defended all nine fuel purchases;
however, the questions were intrusive and went beyond nitpicking. There was no *bona fide* issue
presented in this meeting; instead Chrysler used this meeting as further retaliation and
harassment against Mr. Menard. Mr. Meredith questioned Mr. Menard on items Chrysler knew
or should have known about, including why Mr. Menard fueled up the vehicle within his district,
during business hours, or during his home on days that Mr. Menard worked from home (as
permitted and necessary).

83.     Chrysler did not scrutinize white employees, non-minority employees, or
employees who did not challenge Chrysler by filing discrimination complaints.

84.     After Mr. Menard filed a discrimination complaint, he was wrongfully denied
reimbursement for fuel purchases on weekends that he explained he made because he was too

18

tired to get gas on a Friday evening after a well-known traffic-laden commute. Upon information and belief other non-minority white employees were not denied reimbursements for these reasons.

### K. Chrysler's Discriminatory and Retaliatory Termination

85.     On or about May 6, 2014, Investigator Kevin Lynch from the New York State Division of Human Rights contacted Chrysler's attorney, Jennifer Rygiel-Boyd from the firm Ogletree Deakins, Nash, Smoak & Stewart, P.C. to notify Chrysler that Mr. Menard intended to pursue his discrimination claims in Federal Court, and that he was therefore requesting a withdrawal of his claims for administrative convenience.

86.     The next day, on May 7, 2014, Chrysler terminated Mr. Menard at the end of a work day.  Mr. Menard had faithfully served Chrysler for 28 years, and Chrysler terminated him without warning, on the very same day Chrysler provided him a new 2015 field car, a 2015 Chrysler 200, to present to all his dealers for what Chrysler refers to as a "competitive comparison."

87.     Following his termination, Chrysler refused Mr. Menard's request to drive the company car Chrysler provided Mr. Menard for another month until he purchased a new car. Chrysler denied this request and demanded that Mr. Menard return the vehicle immediately. Chrysler's denial was contrary to Chrysler's decision to permit other white and/or non-minority employees who had not submitted discrimination complaints to drive the company car Chrysler had provided them with for approximately a month's time after they were terminated.

88.     Following Mr. Menard's termination Chrysler also refused to reimburse Mr. Menard for expenses he had incurred while at Chrysler, and Mr. Menard's supervisor prepared

expense reports for Mr. Menard without contacting Mr. Menard and without having the requisite information to prepare a complete report.

*L. Kommor's Discriminatory Treatment of Other Minorities*

89.    Mr. Kommor also discriminated against other minority employees by, among other things, making their work environments hostile. Mr. Kommor voiced his disapproval of Ryan Benard, who was a black minority employee. Mr. Kommor talked down to Mr. Bernard, and even told Mr. Bernard that he did not like him. Mr. Kommor also unjustifiably placed Mr. Benard on a bogus PIP.

90.    The hostile work environment Mr. Kommor created for Mr. Bernard became so egregious that Mr. Benard left Chrysler even through he had been with the company more than 5 years.

91.    Mr. Menard also witnessed Mr. Kommor discriminate against Sean Parks, who is also a minority and is Korean.  Despite the fact that Mr. Parks is and was extremely talented and one of the best performers in the group, Mr. Kommor bullied Mr. Parks in a similar manner to how he bullied Mr. Menard. Mr. Kommor also placed Mr. Parks on a bogus PIP just like Mr. Menard and Mr. Bernard.  Because he was so talented, Mr. Parks was promoted more than once, but because Mr. Parks was harassed and mistreated by Mr. Kommor and Phil Scrogin, Mr. Parks requested to return to the field to avoid being under the management of Mr. Kommor and Mr. Scrogin and the discriminatory environment they created.

92.    On or about September 4, 2013, Mr. Menard notified Chrysler's Human Resources employee Saprina Wade of three other instances where Mr. Kommor reprimanded other minority employees with PIP's. Mr. Menard was familiar with the circumstances surrounding these unwarranted PIP's, which upon information and belief were used by Mr.

Kommor to further his discriminatory motives. Notably, one of the minority PIP recipients was ranked number one in Chrysler's Whitespace Tracker program and was a top performer. Chrysler also terminated another minority employee.

**Chrysler's Disparate Treatment of Mr. Menard In Terms of Promotion and Compensation**

93.     There is no dispute that throughout his career at Chrysler, Mr. Menard met or exceeded performance expectations.  He was consistently recognized as a hard worker who always maintained a positive, professional attitude and delivered superior service to Chrysler and the dealers he serviced.  This was evidenced by sales figures that Chrysler tracked.  Mr. Menard consistently ranked above average in Chrysler's performance metrics.

94.     Notwithstanding the fact that Mr. Menard' performance was by all accounts good throughout his tenure at Chrysler, Mr. Menard was compensated less than his white counterparts.

## FIRST CAUSE OF ACTION

### Racial Discrimination in Violation of 42 U.S.C. § 1981

95.     Plaintiff realleges and incorporates herein by this reference each and every allegation contained in the above paragraphs herein.

96.     From in or about 1986 until and through May 7, 2014, plaintiff was an employee of Chrysler and/or its corporate predecessor.

97.     During this time period, plaintiff repeatedly suffered racial discrimination and harassment at Chrysler, including, but not limited to, being paid less than similarly situated white employees, not being promoted at the same rate as similarly situated white employees, not being sponsored for permanent residency, and being harassed and yelled at and treated poorly as compared to his white coworkers.

98.    The racial discrimination and harassment plaintiff suffered Chrysler's hands

denied him the benefits, privileges, terms and conditions of the contractual relationship right to

make and enforce contracts in violation of 42 U.S.C. § 1981.

99.    Chrysler's actions were willful, wanton, reckless, and malicious, and further show

a complete and deliberate indifference to, and conscious disregard for Mr. Menard's rights.

Therefore, plaintiff is entitled to an award of back-pay and lost wages and benefits, injunctive

relief, including reinstatement to the position he was discriminatorily discharged from, in

addition to punitive or exemplary damages in an amount sufficient to punish Chrysler or deter it

and other companies from like conduct in the future.

100.    Plaintiff is also entitled to recover from Chrysler reasonable attorneys fees, as

provided by 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

### Hostile Work Environment and Unlawful Retaliation under Title VII

101.    Plaintiff realleges and incorporates herein by this reference each and every

allegation contained in the above paragraphs herein.

102.    As described above, Chrysler has taken adverse employment actions against

Plaintiff, subjected him to a hostile work environment and/or maintained an atmosphere of

adverse actions, due to his race, national origin and/or his ethnicity and/or opposition to

discriminatory practices, in violation of Title VII of the Civil Rights Act of 1964.

103.    By reason of Chrysler's discriminatory actions against Plaintiff on account of his

race, national origin and/or ethnicity, and protected actions, Plaintiff has suffered a loss of

earnings and benefits, future earnings and benefits, great pain, and mental anguish.  Plaintiff is

thus entitled to an award of back pay and front pay, and all forms of applicable compensatory damages, equitable relief, and any other damages and/or remedies permissible under law.

104.    Because of Chrysler's unlawful retaliation, Plaintiff is entitled to an award of punitive damages and to recover his costs and attorneys' fees pursuant to 42 U.S.C. §2000e.

## THIRD CAUSE OF ACTION

### Racial Discrimination Under the New York Executive Law

105.    Plaintiff realleges and incorporates herein by this reference each and every allegation contained in the above paragraphs herein.

106.    By the acts and practices described above, including but not limited to being paid less than non-black comparators, not being promoted at the same rate as non-black comparators, and being harassed and treated poorly as compared to his non-black co-workers, Chrysler discriminated against plaintiff in the terms and conditions of his employment on the basis of his race in violation of the Executive Law.

107.    Chrysler is liable as plaintiff's "employer" pursuant to the Executive Law.

108.    By reason of Chrysler's discriminatory actions against Plaintiff on account of his race and national origin / ethnicity, Plaintiff has suffered a loss of earnings and benefits, future earnings and benefits, great pain, and mental anguish. Plaintiff is thus entitled to all forms of applicable compensatory damages, equitable relief, and any other damages and/or remedies permissible under the Executive Law.

## FOURTH CAUSE OF ACTION

### Retaliation under the New York Human Rights Law

109.    Plaintiff realleges and incorporates herein by this reference each and every allegation contained in the above paragraphs herein.

110.    Chrysler's conduct in terminating Plaintiff's employment and retaliating against him by continuing to harass him after he complained to Chrysler's Human Resources and/or Diversity Department(s) of his unlawful treatment and ultimately terminating his employment constitutes unlawful retaliation against Plaintiff in violation of the New York Executive Law, §§290 *et seq.*, and specifically §296.

111.    The conduct of Chrysler in terminating Plaintiff's employment and retaliating against him one day after Chrysler was notified that Plaintiff elected to bring his discrimination claims to Federal Court constitutes unlawful retaliation against Plaintiff in violation of the New York Executive Law, §§290 *et seq.*, and specifically §296.

112.    By reason of Chrysler's discriminatory and retaliatory actions against Plaintiff on account of his reporting the discrimination, both to Chrysler internally and externally filing a discrimination charge with the New York State Division of Human Rights (the "Division") and Equal Employment Opportunity Commission, and later informing the Division's Investigator that Plaintiff intended to pursue his discrimination claims in Federal Court , Plaintiff was unlawfully terminated and suffered a loss of earnings and benefits, future earnings and benefits, great pain, and mental anguish.  Plaintiff is thus entitled to all forms of applicable compensatory damages, equitable relief, and any other damages and/or remedies permissible under the Executive Law.

## FIFTH CAUSE OF ACTION

### Violation of New York Labor Law

113.   Plaintiff realleges and incorporates herein by this reference each and every allegation contained in the above paragraphs herein.

114.   Chrysler violated the New York Labor Law, Section 198-c by failing to reimburse Plaintiff for business expenses he incurred as an employee and a District/Area Sales Manager.

115.   As a result of the foregoing violations, Plaintiff is entitled to recover his actual damages, liquidated damages, interest at the statutory rate and attorney's fees.

## SIXTH CAUSE OF ACTION

### Breach of Contract

116.   Plaintiff realleges and incorporates herein by this reference each and every allegation contained in the above paragraphs herein.

117.   Chrysler had an agreement with Plaintiff that Chrysler would reimburse Plaintiff for meals and other business expenses, including fuel, food, and other travel expenses incurred by Plaintiff.

118.   Plaintiff relied on this agreement and satisfied his end of the contract by doing business for Chrysler and incurring expenses on credit and account and in his personal name.

119.   Chrysler breached its contract with plaintiff by refusing to reimburse him for expenses he incurred and preventing him from submitting expense reports following his unlawful termination.

120.   Plaintiff was financially damaged by Chrysler's breach of contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an award:

  a. Declaring the acts and practices complained of herein are in violation of 42 U.S.C. § 1981, the Executive Law, Title VII of the Civil Rights Act of 1964 and New York Labor Law.

  b. Directing Chrysler to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

  c. Directing Chrysler to place Plaintiff in the position he would be in but for Chrysler's discriminatory and retaliatory treatment of him, and to make him whole for all earnings he would have received but for Chrysler's discriminatory and retaliatory treatment, including but not limited to, wages and other lost benefits;

  d. Directing Chrysler to reinstate Plaintiff;

  e. Directing Chrysler to pay Plaintiff punitive damages as provided by 42 U.S.C. § 1981;

  f. Directing Chrysler to pay an additional amount to compensate Plaintiff for the emotional distress Chrysler's unlawful conduct has caused Plaintiff;

  g. Awarding Plaintiff such interest as is allowed by law;

  h. Awarding Plaintiff his reasonable attorneys fees and costs; and

  i. Granting such other and further relief as the Court deems necessary and proper

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to the Seventh Amendment of the Constitution and

Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: August 8, 2014
      Nanuet, New York

By:          _____
               Karen L. Zdanis (KZ3651)
               ZDANIS LAW FIRM, PLLC
               Old Turnpike Road, Suite 304
               Nanuet, New York 10954
               (854) 356-0855

               Michael D. Steger, Esq. (MS2009)
               STEGER KRANE LLP
               30 Ramland Road, Suite 201
               Orangeburg, NY  10962
               (845) 359-4600